IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ABRAHAM DEVRIES, an individual; | ) | |
| CURTIS DEVRIES, an individual; and | ) | |
| MARVIN DEVRIES, an individual, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | CASE NO. CV 04-136-S-EJL |
| DELAVAL, INC., a Delaware corporation; | ) | |
| BLUE DIAMOND DELAVAL LLC, dba | ) | **REPORT AND RECOMMENDATION** |
| Dairy Services, a Delaware limited liability | ) | |
| company; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

Plaintiffs Abraham DeVries, Curtis DeVries, and Marvin DeVries (collectively

"DeVries") filed this action against Defendants DeLaval, Inc. and Blue Diamond DeLaval, LLC

(collectively "DeLaval"), alleging claims for breach of contract, strict liability, and fraud.

Currently pending before the Court for its consideration are the following motions:

(1) Defendants' Motion for Summary Judgment (Docket No. 23), filed on January 5, 2006; and

(2) Plaintiffs' Motion to Amend/Correct to Add Claim for Punitive Damages (Docket No. 32),

filed on January 6, 2006.  On March 24, 2006, the Court heard oral argument on the motions.

Having reviewed all briefing submitted, as well as other pertinent documents in the Court's file, the Court enters the following Report and Recommendation as follows.

## REPORT

## I.
### Background

Plaintiff Abraham "Abe" DeVries is the owner of a large dairy operation in the state of California. In 1998, he started the DeVries Dairy Facility near Kuna, Idaho and funded the start-up of a dairy operation for his two sons, Plaintiffs Curtis and Marvin DeVries in the same area. Curtis DeVries, in partnership with his father operates his dairy farm under the name of Carousel Farms. Marvin DeVries, also in partnership with his father, operates his dairy farm under the name of Syringa Farms. Both Carousel Farms and Syringa Farms share the DeVries Dairy Facility although both the operations are maintained separately.

In May 1998, Abe DeVries agreed to purchase a rotary milking system manufactured by DeLaval. (Purchase Agreement). The purchase price for the dairy equipment, including installation of that equipment, was $599,999. Abe DeVries purchased the equipment at a discount price because this was the first DeLaval rotary system installed in the region and DeLaval hoped it would help with their marketing in this area.[1] Soon after the DeVries began milking cows with the DeLaval dairy equipment, they began to experience problems with the equipment. The DeVries' complaints focused primarily on problems relating to the vacuum system, milk-line, takeoffs and related components. As the equipment was not working

---

[1]Plaintiff Abe DeVries testified that he obtained a substantial discount for the purchase of the system from DeLaval. His other two bids were at least $700,000 higher than DeLaval.

**Report and Recommendation - Page 2**

correctly, it was causing some injury to the cows' udders, which resulted in related "mastitis" infections, which had to be treated by a veterinarian.

In the early months of 2000, DeLaval engaged in extensive efforts to remedy the problems the DeVries had been experiencing.  The DeVries asked the DeLaval technicians to examine and repair the automatic milk machine take-offs, computer ID system, sort gate, the shield on the rotary and the design flaw that allowed the cows to consistently break stalls on the rotary.  Despite the technicians' efforts, the DeVries continued to experience problems with the DeLaval dairy equipment.

In November 2000, in an effort to remedy the continuing problems, representatives of DeLaval met with Curtis DeVries, Marvin DeVries, and other members of the DeVries family to discuss how to resolve the problems caused by the dairy equipment.  Ultimately, the DeVries and DeLaval executed settlement agreements in February 2001 entitled "Releases" by which DeLaval agreed to remove the ALPRo system then installed at the DeVries dairy and replace it with new equipment as detailed in Exhibit B attached to the Release ("New Equipment").  Exhibit B described the New Equipment as: (1) 60 Right-hand EcoDetachers; (2) 60 Detacher controls/valves; (3) 60 Pulsators with individual controls; and (4) a four-amp power supply.  In addition, DeLaval agreed to provide:

- Cash payments of $150,000 to Curtis DeVries, $50,000 to Marvin DeVries, and $50,000 to Abe DeVries, for a total of $200,000 in cash payments.

- A $69,999 credit to Abe DeVries to cover the remaining amount due to DeLaval for the system.

- Payment of up to $8,370 to a third party fo the cost of moving a piece of equipment.

- Free standard scheduled service for the New and Original Equipment for one year, and a 10% discount of such service for two more years.

- DeLaval also agreed to supply all of the DeVries' needs for cleaners, sanitizers, teat dips, liners and filters for a period of three years after the date the Releases were signed - at no charge the first year.

In exchange, Curtis and Marvin DeVries signed a release agreement with DeLaval as follows:

> That he releases and gives up any and all claims and rights, known and unknown, which he now has or may have in the future against Dealer or DeLaval or any of their officers, employees or affiliated companies including, but not limited to claims for breach of warranty, misrepresentation, lost income, lost milk production, injury to cattle, increased expenses, or consequential damages of any kind caused by or related in any way, directly or indirectly, to the installation, use, operation or maintenance of any of the Original Equipment.

Abe DeVries executed a similarly worded release. In defining "Original Equipment," the release documents reference the original Purchase Agreement, which itemizes the equipment installed.

In addition, the DeVries agreed that the New Equipment would be covered by DeLaval's standard one-year Limited Warranty, which the parties agreed to extend to a term of three years. The Limited Warranty warrants the equipment to be "free from defects in material and workmanship." Through the Limited Warranty, DeLaval agreed to repair or replace any item of Equipment which was not as warranted. If DeLaval was unable to repair the equipment, it agreed to refund the purchase price (excluding the cost of installation labor). The Limited Warranty further excluded any other remedies, specifically precluding the DeVries from recovering damages of any kind in excess of a refund of the purchase price refund remedy.

The DeVries maintain that they only signed the release agreements because they "were desperate to fix the problems with the dairy," (Pl's. Rsp. Br. 4), as they had allegedly suffered more than $1.5 million in damages at the time they entered into the Releases. During the time the DeVries and DeLaval were negotiating the release agreement, the DeLaval told the DeVries

**Report and Recommendation - Page 4**

that it was committed to making the dairy equipment work properly.  The DeVries further allege that DeLaval assured them that they would make the equipment work "no matter what it took, and no matter what the cost."  (Pl's. Rsp. Br. 3.)  According to the DeVries, they reasonably believed that DeLaval had taken the necessary steps to ensure the recommended changes in the dairy system would cause it to function properly in the future based on DeLaval's assurances and because the "DeLaval dairy equipment was fully integrated and had been designed, manufactured and installed by DeLaval."  *Id.*  The DeVries state they relied upon DeLaval's representations that it would solve the continuing problems with the dairy equipment.

DeLaval began the installation of the New Equipment after the execution of the three Releases.  The installation purportedly took much longer than anticipated by the DeVries.  Without inspecting the facility, Mr. Steve Ramer, a DeLaval employee in the Kansas City location, had earlier recommended the installation of the EcoDetachers.  The DeVries allege that Mr. Ramer was aware that DeLaval had experienced significant problems with the EcoDetachers at the time he recommended their installation at the DeVries' already problematic dairy facility.  In support of this contention, the DeVries cite to an April 11, 2001 email sent by Mr. Ramer to Mr. Storm, in which Mr. Ramer wrote, "Universal has never design[ed] an option for a remote start circuit for an EcoDetacher in a parlor....There are a number of design steps that must be taken prior to this work being done ...[f]ailure to take these steps almost insures there will be problems later."  *See* Kurtz Aff., Ex. D, Ex. 18.  According to the DeVries, DeLaval never informed them of this potential problem.

In further support of their allegation that DeLaval improperly installed the EcoDetachers despite its alleged problems, the DeVries refer to another internal email sent on June 13, 2001 by

**Report and Recommendation - Page 5**

Mr. Storm to Bill Thompson, then Vice-President of DeLaval.  Mr. Storm informed Mr.

Thompson in the email that the DeVries were experiencing problems with the EcoDetachers and

that Mr. Ramer had informed him that morning that "this was not a new problem" and that the

problem had been going on for 3-4 months.  *See* Kurtz Aff, Ex. D, Ex. 16.  Mr. Storm continued,

"[i]t would have been nice if someone could have given us some warning of this problem before

we were blind sided out at this particular dairy."  *Id.*

        The next day, on June 14, 2001, DeLaval sent an in-house veterinarian, Jeff Durkin, to

test the system.  Durkin informed the DeVries that the system appeared to be functioning

properly.  The DeVries maintain Durkin did not mention any potential problems with the

EcoDetachers at this time.  In addition, another DeLaval employee, Jim Hipwell, purportedly

conducted pulsation tests that indicated the equipment fluctuated beyond acceptable levels and

that this could cause damage to the dairy cow teats.  DeLaval allegedly did not inform the

DeVries of this problem; instead, DeLaval criticized the DeVries' dairy practices, calling the

DeVries "a bunch of whiners" and poor managers who could not be pleased.  (Hipwell Depo. 62:

18; 64:17-20, Ex. C to Kurtz Aff.).

        The DeVries further allege that the newly installed DeLaval equipment never functioned

properly, although the DeVries concede DeLaval made repeated attempts to solve the problems

through March of 2002.  Despite DeLaval's attempts to fix the problems, the DeVries maintain

that both Curtis and Marvin's dairy operations continued to experience high bacteria counts in

their milk.  Apparently, the DeVries saw the somatic cell counts ("SCC") increase from the

range of approximately 300,000 to 700,000 to 900,000 SCC.  The expected SCC for a dairy

operation in Southern Idaho is less than 200,000 with a SCC number higher indicative of injuries to the dairy herd.

The DeVries' complaints are not limited to the dairy equipment.  The DeVries also allege that DeLaval supplied the DeVries' dairy farms with mislabeled and defective farm chemicals in order to fulfil DeLaval's obligation to supply chemical and supplies free of charge for the first year to the DeVries pursuant to the terms of the Release.  Chris Rich, an employee of DeLaval, testified in his deposition that DeLaval's General Manager, Tom Storm, had instructed him to mix expired or nearly expired teat dips with differing levels of iodine (a main ingredient in teat dip) in a container for another brand of teat tip.  (Rich Depo. 51-53, Ex. A to Kurtz Aff).  Mr. Storm allegedly instructed Mr. Rich to "dump" the expired teat dip on the DeVries.  It is undisputed that the mislabeling of teat dip violates the Federal Food Drug & Cosmetics Act and is a misdemeanor.  21 U.S.C. § 331, et seq.

On March 15, 2002, the DeVries informed DeLaval that they had decided to purchase chemicals and supplies from another company because of the problems of continually high SCC counts, the extensive teat damage, and the high incidence of mastitis, which persisted even with the New Equipment.  The DeVries maintain that the SCC counts and the mastitis in the cows began to decrease and the sediment problems were reduced after they discontinued the use of DeLaval products.

On March 28, 2002, Mr. Ramer drafted a "Milker Service Bulletin" to be sent to DeLaval Dealers regarding the dismantling and reinstallation of certain part, including the replacement of diaphragms and relocation of the milk valve, to ensure the EcoDetacher system would function properly.  It does not appear that the DeVries waited for DeLaval to upgrade their EcoDetacher

system.  Instead, the DeVries recruited Norm Zuidema of Valley Equipment Co., Inc. out of

Ontario, California to come to the DeVries Dairy Facility to evaluate the system.[2]

Valley Equipment's first inspection revealed that the vacuum fluctuation for the DeLeval

equipment was substantially in excess of acceptable industry maximum fluctuation standards,

which resulted in substantially more "squawking" in that barn than would be expected of an

operation that size.   Mr. Zuidema opines that because the fluctuations in the vacuum he

observed exceeded industry standards to such a degree that cows milked on that system would

have suffered extreme discomfort during the milking process.  After further tests and attempts to

fix the problems with the milking system, Valley Equipment recommended that the automation

and pulsation equipment be replaced because DeLaval had been unable to make the equipment

work properly.  The new equipment recommended by Valley Equipment was installed in March

2003.

Furthermore, Valley Equipment recommended the installation of a 4" stainless steel

pipeline to replace the 3" stainless steel pipeline that was currently installed in order to allow the

dairy facility to operate at an appropriate level.  The original Purchase Agreement had provided

that DeLaval would install a 4" stainless steel pipeline.

Apparently, with the installation of the 3" pipeline, the wash-up system installed by

DeLaval did not function properly.  When a wash-up system does not function properly, it is

likely to cause of a build-up of bacteria in the milk system.  Because of this, Valley Equipment

made the decision to replace the wash-up system.  The total cost for the work performed and the

equipment supplied by Valley Equipment was $419,874.29.  The DeVries contend that since the

---

[2]Mr. Zuidema had sold dairy equipment to Abe DeVries' California dairy operation.   He has also been
designated an expert witness by the DeVries.

**Report and Recommendation - Page 8**

changes made by Valley Equipment, the injuries to the cows manifested by the high somatic cell counts have steadily and significantly been reduced and milk production has greatly increased.

On July 2, 2003, DeLaval sent a letter to Abraham DeVries offering to pay $51,554 as the full purchase price of the EcoDetachers, power supplies and pulsators.  The DeVries refused the offer, arguing that this figure did not represent the full purchase price of the equipment installed pursuant to the Releases.  In his deposition, Tom Storm estimated the cost of the equipment to be $90,000.  (Storm Dep. 122:6, Ex. B to Points Aff.).  Furthermore, the DeVries allege that they have suffered more than $1.5 million in damages caused by the defective DeLaval equipment.  Thus, they suggest damages should be the value of those claims less the amount of approximately $300,000 paid to the DeVries.

## II.
## Motion for Summary Judgment

### A. Standard of Review

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (1993).  A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party meets the requirement of Rule 56 by showing either that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's

case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations of denials of his pleadings." *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* at 249-250. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe*, 633 F.2d 531 (9th Cir. 1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact."  *Hanon v. Dataproducts Corp*., 976 F.2d 497 (9th Cir. 1992).

In order to withstand a motion for summary judgment, the non-moving party:

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

### B. Analysis

DeLaval moves for summary judgment on several grounds. DeLaval first argues that all but one of the DeVries' claims for breach of contract and strict liability are barred by the Releases executed in February 2001 since the problems reported by the DeVries relate to the Original Equipment installed by DeLaval. Second, DeLaval argues that the DeVries' remaining claim relating to the pulsators (New Equipment) is subject to DeLaval's limited warranty providing only for repair, replacement, or refund of the purchase price. DeLaval asserts that it offered to refund the purchase price of the New Equipment it installed and argues that it has satisfied its obligations under the Limited Warranty with respect to the pulsators. Finally, DeLaval argues that DeLaval's strict liability claim must fail because the DeVries only seek damages for a purely economic loss, which are barred in products liability actions sounding in tort.

### A. The DeVries argue that the releases have no legal effect.

While DeLaval argues that all but one of the DeVries' claims for breach of contract and strict liability are barred by the Releases executed in February 2001, the DeVries contend that DeLaval fraudulently induced them into entering into the February 2001 Releases, therefore the Releases are not enforceable.

**Report and Recommendation - Page 11**

Specifically, the DeVries allege DeLaval employees falsely represented that the installation of the New Equipment would solve the problems at the DeVries Dairy Facility and that DeLaval remained committed to making the dairy equipment function properly.  Second, the DeVries argue the Releases should be set aside because "DeLaval failed to disclose its knowledge that the EcoDetachers did not function properly."  (*See* Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, p. 17.)  Third, the DeVries allege DeLaval intentionally delivered mislabeled teat dip after the Releases were signed and that "it is reasonable to infer that [DeLaval]...intended to deliver the mislabeled teat dip at the time it entered into the Releases."  *Id.*  In addition, the DeVries argue that DeLaval "fraudulently concealed test results showing the dairy equipment was not functioning during and immediately following the installation of that equipment."  *Id.*  Finally, the DeVries allege that DeLaval failed to disclose that it had installed a 3" milk line before the Releases were signed, and the President of Delaval, Mr. Maharay, admitted that it did not intend to obtain a release from its obligation to deliver a 4" milk line when he signed the Release in February 2002.

Idaho courts recognize that "[a]n agreement to settle a legal dispute is a contract and its enforceability is governed by familiar principles of contract law.  *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).  In accordance with standard principles of contract law, a release may be set aside if induced by fraud, undue influence, mistake, or deceit.  *Mortas v. Korea Ins. Corp.*, 840 F.2d 1452 (9th Cir. 1988); *see also Heath v. Utah Home Fire Ins. Co.*, 89 Idaho 490, 491 (1965).  Thus, in order to survive summary judgment, the DeVries must establish a genuine issue of material fact that they were fraudulently induced into executing the Releases for those claims

based on their arguments that the Original Equipment, as defined in the Purchase Agreement, was defective.

Establishing a claim of fraud requires a plaintiff to prove the following elements:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth; (8) the hearer's right to rely thereon; and (9) the consequent and proximate injury.

*G&M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 518, 808 P.2d 851, 855 (1991)(citations omitted).  A party alleging fraud must plead with particularity the factual circumstances constituting fraud for each of these elements.  *Id.*  Once the party alleging fraud reaches trial, it carries the burden of proving each element by clear and convincing evidence.  *Id.*

### 1.    Representation that New Equipment Would Solve the Problems at the Dairy Operation

The DeVries contend DeLaval fraudulently induced them into executing the February 2001 releases by representing that the installation of the New Equipment would solve the problems at the DeVries Dairy Facility and that DeLaval remained committed to making the dairy equipment function properly.  The DeVries further contend that DeLaval never conducted any analyses or engineering study to determine whether the recommended changes in the dairy equipment would result in the dairy facility functioning properly as DeLaval allegedly promised; thus, DeLaval had no reasonable basis for believing the installation of the proposed equipment would solve the problems of the DeVries Dairy Operation.

The Court has serious concerns whether the alleged statements made by DeLaval that it "was committed to making the dairy equipment work properly" and it "would do whatever was necessary to make that happen, no matter what it took, and no matter what the cost" may serve as

a legitimate predicate for a claim of fraud.  As a general rule, fraud cannot be based upon statements promissory in nature that relate to future actions or upon the mere failure to perform a promise or an agreement to do something in the future. *Pacific States Auto. Fin. Corp. v. Addison*, 45 Idaho 270, 261 P. 683 (1927).  The allegedly false representation must concern past or existing material facts. *Moroun v. Wyreless Systems, Inc.*, 141 Idaho 604, 114 P.3d 974 (2005); *see also, In re Syntex Corp. Secs. Litig.*, 95 F.3d 922, 934 (9th Cir.1996) (Predictions proved to be wrong in hindsight do not render the statements untrue when made).  Here, DeLaval's alleged statements relate to an event occurring in the future, and thus may not serve as a basis for fraud.

The Court reaches this conclusion despite the DeVries attempt to analogize this case to *G&M Farms v. Funk Irrig. Co.*, 119 Idaho 514, 808 P.2d 1045.  In *G&M Farms*, the plaintiff negotiated the purchase of an agriculture irrigation system from the defendant manufacturer and dealer.  During the course of the negotiations, the defendant dealer made certain representations to the plaintiff that it would work and that they had "thousands" of these irrigations systems that had been a "great success" and had been operating with no customer complaints.  *Id.* at 519, 808 P.2d at 856.  While the trial court concluded the dealer's statements could not serve as a basis for fraud because they related to future events, the Idaho Supreme Court reversed, finding that the dealer's failure to disclose known facts relating to the flawed design and likely malfunctioning of the irrigation system fell within the category of intentional misrepresentation cases based on nondisclosure of material information.  *Id.* at 520, 808 P.2d at 857.

The Idaho Supreme Court based its conclusion on two indemnity agreements entered into by the dealer indicating the dealer knew the equipment ordered by the plaintiff was not designed for its particular farm and that the irrigation system possessed certain operational characteristics

which might cause it to malfunction or shut down under normal conditions.  At the time the

plaintiff agreed to purchase the irrigation system, only the dealer knew of the operational and

design defects and such defects were not readily discoverable to the plaintiff, thus giving rise to

the inference that the parties were not dealing on equal footing.  Furthermore, the court did not

construe the dealer's statements that there were "thousands of these machines around"  as mere

"trade talk" or "puffing" because the court held that this rule does not apply when the parties are

on unequal footing and record indicated there were only twenty-five or thirty of "these machines

around" and only four of the precise type the plaintiff purchased – not "thousands."

        The Court does not find the circumstances in *G & M Farms* analogous to this case.  In

*G&M Farms*, the plaintiff submitted two indemnity agreements entered into by the dealer

indicating it knew the irrigation system would not work, as well as deposition testimony

concerning the extensive troubled history with the irrigation system purchased by the plaintiff.

Conversely, in this case, the DeVries rely solely on the fact that DeLaval has not produced any

documents demonstrating that DeLaval conducted any analysis or had any basis for believing that

it could fix the problems at the dairy.  Simply because DeLaval did not conduct an extensive

study to determine whether the recommended changes in the dairy equipment would ensure the

proper functioning of DeVries dairy facility does not prove that DeLaval believed its equipment

would not work, or that it was reckless in believing its equipment would work.  The DeVries were

obligated to submit sufficient evidence to raise an issue of material fact that DeLaval had no

present intention of following through on the representations of which the DeVries complain at

the time the statements were made in order for the statements to be actionable.  Yet, the DeVries

have not submitted any evidence that DeLaval knew the new equipment would not solve the

**Report and Recommendation - Page 15**

problems at the dairy.  Nor have the DeVries submitted any evidence that DeLaval did not intend to keep its alleged promise to do whatever it took and at whatever the cost to ensure the equipment would not work properly.  For these reasons, the DeVries may not rely on these alleged statements of future events as a basis for their fraud claim.

### 2. EcoDetachers

In addition, the DeVries predicate their claim for fraud based on the DeLaval's alleged failure to disclose its knowledge that the EcoDetachers were defective.  To prove that DeLaval knew the EcoDetachers were defective, the DeVries submit an April 11, 2001 email wherein Mr. Ramer wrote to Mr. Storm cautioning him regarding the installation of a remote start on the EcoDetachers being installed at the DeVries dairy facility.  Specifically, Mr. Ramer wrote in the email, "Universal has never design[ed] an option for a remote start circuit for an EcoDetacher in a parlor.  There are a number of design steps that must be taken prior to this work being done...[f]ailure to take these steps almost insures there will be problems later."  (*See* Kurtz Aff, Ex. D, Ex. 18.)

Then, on June 13, 2001, Mr. Storm wrote an email to Bill Thompson stating the DeVries were having problems with the EcoDetachers and that he was informed that morning by Mr. Ramer that "this was not a new problem...and that it had been going on for 3-4 months."[3]  (Kurtz Aff, Ex. D, Ex. 16.)  Mr. Storm continued, "Devries hit us real hard this morning about premature failure on the units already there [sic] comment was 'this is what we expected'.... It would have been nice if someone could have gave us some warning of this problem before we were blind

---

[3]The importance of the email which mentioned problems with the EcoDetachers going back 3 or 4 months is that this would put DeLaval on notice of possible problems with the equipment as early as February 13/March 13, 2001.  The Releases were executed on February 28, 2001.

sided out at this particular dairy." *Id.*  The installation of the EcoDetachers was completed in July 2001.  Nearly a year later, on March 28, 2002, after the DeVries had employed another company to fix the milking system, Mr. Ramer distributed a "Milker Service Bulletin" to all DeLaval dealers regarding the dismantling and reinstallation of certain parts to "upgrade" the EcoDetacher system so that it would function properly.

In response, DeLaval maintains that only after the Releases were signed did its employees realize that they may encounter problems with the EcoDetachers at the DeVries' dairy facility. Steve Ramer testified that he probably was the first person to become aware of the problems with the EcoDetachers when he began receiving some calls from dealers.  Ramer further testified that when DeLaval begins receiving complaints regarding its equipment, it follows a certain process to determine if the problem is systemic or restricted to a few isolated instances.  During the course of this process, DeLaval checks the numbers on the warranty to confirm how many complaints regarding the equipment it had actually received.  Then it performs tests on the equipment and contacts the supplier to try to determine the exact nature of the problem.  Thus, according to Mr. Ramer, it can take 3-4 months to ascertain whether a significant problem with the equipment actually exists.

In the Court's estimation, the DeVries have failed to show that DeLaval knew the EcoDetachers were defective when they signed the Releases.  In fact, Ramer testified he believed the EcoDetachers would work properly at the DeVries dairy facility.  Furthermore, DeLaval was able to effectively and promptly remedy the problem by replacing each of the diaphragms, which were causing the problems.  Because there is not sufficient evidence to raise a genuine issue of material fact as to whether DeLaval knew the EcoDetachers would not work at the time it signed

the Releases, the DeVries may not rely upon the subsequent problems with the EcoDetacher as a basis for their claim of fraudulent inducement.

### 3. Installed 3" as opposed to 4" Milk Line

The DeVries next argue that DeLaval fraudulently concealed the installation of the 3" milk line when the original Purchase Agreement required the installation of a 4" milk line at the DeVries Dairy.  Tom Storm admitted that he knew that only a 3" milk line had been installed at the DeVries Dairy Facility before he signed the February 2001 Releases.  According to the DeVries, instead of informing the DeVries of this fact and attempting to correct the problem, Tom Storm engaged in a "cover-up" and attempted to convince the DeVries that the removal of the ALPro system and the installation of the EcoDetachers was all that was needed to correct the problems at the DeVries Dairy Facility.

The Court agrees that the February 2001 Release should not apply to any claim regarding the milk line, assuming the truth of the DeVries' allegations that DeLaval failed to disclose it had installed a 3" milk line rather than the 4" milk line.  DeVries had a right to rely on DeLaval's nondisclosure when it agreed to release any claims regarding the milk line.  However, the DeVries may not rely upon DeLaval's nondisclosure regarding its installation of a 3" milk line rather than a 4" milk line as a basis for invalidating the Releases in their entirety.

### 4. Mislabeled Teat Dip

The DeVries also contend DeLaval fraudulently supplied mislabeled teat dip – an udder hygiene product used to sanitize the cow's teats prior to and after milking, which is used to kill bacteria and prevent mastitis and is crucial to a dairy operation.  As part of the Release agreement, DeLaval agreed to supply farm chemicals, including teat dip, to the DeVries without

charge for a period of one year.  The record suggests Tom Storm, DeLaval's General Manager,

ordered Chris Rich, an employee, to deliver to the DeVries 250 gallons of teat dip that had

expired and was mislabeled in violation of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.

§ 331.  Specifically, Mr. Rich testified that Mr. Storm told him, "[t]his stuff you are going to have

a hard time selling.  Just take it out to the DeVries' and dump it."  (*See* Kurtz Aff., Ex. A, 52:6-

23.)

Mr. Rich contacted Bill Vandersluis, the District Sales Manager for DeLaval during the

relevant time period, to inform him that he had been instructed to deliver and did deliver

mislabeled and expired teat dip.  Mr. Vandersluis failed to convey this information to the DeVries

and Mr. Vanersluis conceded this failure was "not the right thing to do."  (*Id.* 46:9-12.)

While the Court agrees that Mr. Storm's conduct, if true, is especially egregious, it does

not necessarily agree with the DeVries' contention that it is reasonable to infer that Mr. Storm

planned to "dump" mislabeled and expired teat dip when he signed the Releases.  Therefore, the

DeVries cannot use this alleged conduct as a basis for their claim that there were fraudulently

induced into entering the Releases.

**5. Pulsators**

Finally, the DeVries argue DeLaval fraudulently concealed the results of the test

conducted by Mr. Hipwell indicating that the pulsators were not functioning properly.  On June

14, 2001, before DeLaval had completed the installation of the EcoDetachers, DeLaval sent Jeff

Durkin, the in-house veterinarian, to test the DeVries dairy equipment.  The DeVries allege that

Mr. Durkin reported that the equipment was functioning properly and the DeVries suggest Mr.

Durkin should have informed the DeVries of the new information Mr. Storm had acquired from

**Report and Recommendation - Page 19**

Mr. Ramer in the June 13, 2001 email regarding the problems with the EcoDetachers.  During this same time period, DeLaval's employee, Jim Hipwell, ran several tests which allegedly revealed that the equipment was fluctuating beyond acceptable levels that could result in physical damage to the dairy cows' teats.  However, Mr. Hipwell purportedly did not notify the DeVries of the test results, but instead attributed the problems to the DeVries dairy practices.

Essentially, the DeVries seem to argue that Mr. Hipwell's failure to inform them of the problems with the pulsators, as well as DeLaval's furnishing them with mislabeled teat dip, was part of DeLaval's ongoing fraud to convince the DeVries that it had evaluated the problems at the DeVries' dairy, identified the problems, and knew which remedy would work.  However, all of this conduct occurred after the Releases were signed on February 28, 2001 and cannot serve as a basis for fraudulent inducement to execute the Releases.

### B.  Limited Warranty

DeLaval next argues any claim relating to the New Equipment is subject to the provisions of DeLaval's limited warranty, which limits remedies for complaints about the equipment to repair, replacement or refund of the purchase price.  DeLaval maintains it has satisfied its obligation under the limited warranty with its offer to pay the DeVries the amount of $51,554 for the full purchase price of the New Equipment.[4]  The DeVries, however, respond that DeLaval's attempt to limit the remedy for the delivery of the defective equipment to repair and replacement or return of the purchase price failed of its essential purpose.  As a result of this purported failure, the DeVries argue they are entitled to all the remedies for breach of contract allowed under the

---

[4]DeLaval contend that it has expended in excess of $576,000 in direct payments, materials, and equipment to satisfy the DeVries' concerns over the dairy equipment.

**Report and Recommendation - Page 20**

Uniform Commercial Code despite the separate provision precluding the recovery of any

damages, whether direct, indirect, or consequential.[5]

### 1. Failure of its Essential Purpose

A seller of a product may limit its warranty obligation to the repair and replacement of

defective parts.  *See* I.C. § 28-2-719(1)(a).  However, Idaho Code § 28-2-719(2) further provides

"where circumstances cause an exclusive or limited remedy to fail of its essential purpose,

remedy may be had as provided in this act."  An exclusive repair or replacement remedy is meant

to ensure that a purchaser receives a product free from defects, and if it becomes evident during

the warranty period that the product is defective, this triggers the seller's obligation to cure the

defective product within a reasonable time.  *See Clark v. Int'l Harvester Co.*, 99 Idaho 326, 340,

581 P.2d 784, 798 (1978); *see also* I.C. s 28-2- 309(1).  "If, however, the seller is subsequently

unable or unwilling to repair or replace a defective part within a reasonable time, the buyer is left

with a defective product not conforming to the warranty and the limited remedy has not achieved

---

[5]The  text of the Limited Warranty reads as follows:

**EXCLUSION OF OTHER WARRANTIES**

Other than this Limited Warranty *** **DELAVAL AND SELLER MAKE NO OTHER WARRANTY FOR THE EQUIPMENT OR THE SYSTEM IN WHICH IT IS USED, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE**

**EXCLUSION OF OTHER REMEDIES**

**THE REMEDIES SET OUT ABOVE ARE THE DAIRY PRODUCER'S (AND IF DIFFERENT, DAIRY OWNER'S) EXCLUSIVE REMEDIES FOR BREACH OF THIS LIMITED WARRANTY. IN NO EVENT SHALL DAIRY PRODUCER (OR DAIRY OWNER) BE ENTITLED TO RECOVER DAMAGES OF ANY KIND, WHETHER DIRECT, INDIRECT OR CONSEQUENTIAL (INCLUDING BUT NOT LIMITED TO DAMAGES DUE TO DELAYS IN DELIVERY, LOSS OF PRODUCTION, LOSS OF PROFIT, LOSS OF PREMIUMS, EXCESS CULLING, INCREASED COSTS OF OPERATION, AND LOSS OF, INJURY TO, OR ILLNESS OF LIVESTOCK) IN EXCESS OF THE PURCHASE PRICE REFUND REMEDY SET OUT ABOVE.**

its purpose." *Clark*, 99 Idaho at 340, 581 P.2d at 798.  Proof of negligent or wilful dilatory

conduct is not required under Idaho Code § 28-2-719(2); rather, the section applies even in

circumstances where an exclusive remedy seemed fair and reasonable when the contract was

executed, "but as a result of later circumstances operates to deprive a party of a substantial benefit

of the bargain." *Id. (citing* I.C. § 28-2-719, Official Comment 1).  Conversely, a plaintiff must

also act in good faith to provide a defendant with a reasonable time to repair or replace defective

parts. *Clark*, 99 Idaho at 340, 581 P.2d at 798.

      Here, although DeLaval limited its warranty obligation to repairing or replacing defective

parts, if the milking equipment was defective and DeLaval failed to cure those defects within a

reasonable time after being afforded an opportunity to do so, it would seem the DeVries would be

entitled to pursue their general remedies under the UCC pursuant to I.C. §  28-2-719(2).  The

Court finds a question of fact exists as to whether the New Equipment provided to the DeVries

was defective at the time it was delivered and installed in the DeVries' dairy farms, and, if so,

whether DeLaval was able to cure those defects within a reasonable time.

     **2.  Damages**

      However, this does not necessarily end the inquiry.  Assuming the DeVries are able to

prove at trial that the warranty to repair or replace defective parts failed of its essential purpose,

the issue remains as to what effect the failure of the limited warranty has on the other contractual

provisions excluding liability for all other damages.  As noted above, the DeVries suggest that the

failure of the limited warranty automatically entitles them to "the full array of remedies provided

by the UCC, including the recovery of consequential and incidental damages." *Clark*, 99 Idaho at

342 (*citing* I.C. § 28-2-714 and § 715).  However, the *Clark* court also recognized that in certain

commercial contexts, "the failure of an exclusive remedy does not automatically require disregard of other limitations on liability provided by the agreement." *Id.*

In *Clark*, the plaintiff purchased a tractor for his custom farming business.  In the plaintiff's first year of owning the tractor, several breakdowns in the tractor's engine occurred.  Under the warranty, the defendant seller repaired the problems free of charge.  *Id.* at 330, 581 P.2d at 788.  A year and a half after purchasing the tractor, the plaintiff noticed a loss of power in the tractor, which prevented him from working the fall season with its poor field conditions and he was only able to work the tractor on a limited basis in the spring. *Id.*  When the defendants failed to remedy the plaintiff's problems with the tractor, the plaintiff filed a claim against the defendants for negligent design and manufacture and breach of implied and express warranties.  *Id.*  With respect to the breach of warranty claim, the plaintiff argued the exclusive remedy of repair and replacement of defective parts failed of its essential purpose as a result of defendant's failure to repair the tractor in a reasonable time.  *Id.* at 338, 581 P.2d at 796.

The *Clark* court found a genuine issue of material fact existed whether the defendants failed to cure the tractor's defect within a reasonable time.  The court, however, did not end its inquiry there.  Rather, the court considered whether the contractual provision excluding liability for incidental and consequential damages would still be enforceable assuming the failure of the repair or replacement remedy to achieve its purpose.  *Id.* at 341, 581 P.2d at 799.  To decide this question, the *Clark* court looked to the applicable UCC provisions, as well as to the decisions of other courts, which had also considered this same issue.  In conducting this review, the *Clark* court commented, "[t]he majority of the courts in cases involving the failure of an exclusive remedy contained in a warranty provision which also excludes liability for consequential damages have

ruled that the provisions limiting liability fail also and that the plaintiffs are entitled to the full

array of remedies provided by the UCC, including the recovery of consequential and incidental

damages." *Id.* Courts reaching this conclusion reason that sellers "'cannot at once repudiate their

obligation under their warranty and assert its provisions beneficial to them.'" *Id.* (*quoting Adams v.

J.I. Case Co.*, 261 N.E.2d (1970); *see also Jones & McKnight Corp. v. Birdsboro Corp.*, 320

F.Supp. 39 (N.D.Ill. 1970).

Before applying this reasoning to the facts of that case, the *Clark* court also noted that other

courts have distinguished this line of cases of not allowing the defendant seller to shelter itself

behind the provisions in a warranty, when allegedly repudiating its limited obligations under the

same warranty. For example, in *Am. Elec. Power Co. v. Westinghouse Electric Corp.*, 418 F.

Supp. 435 (S.D.N.Y. 1976), the court upheld a contractual provision limiting liability for

consequential damages despite an alleged failure of the exclusive repair or replacement warranty

to achieve its purpose. 418 F.Supp. at 458. In *Westinghouse*, the Court felt that a better approach

would be to ignore the exclusive remedy clause in the case of its failure "while other clauses

limiting remedies in less drastic manners and on different theories would be left to stand or fall

independently of the stricken clause." *Id.* at 457 (internal quotation marks and citation omitted).

In adopting this approach for that case, the *Westinghouse* court found no reason to disturb the

consensual allocation of business risk embodied in the contract, especially in an agreement that

was painstakingly negotiated between two industrial giants over two years, involving "a highly

complex, sophisticated, and in some ways experimental piece of equipment." The *Westinghouse*

court also found the fact that the plaintiff was still entitled to recover the price of the equipment

pursuant to a separate provision in the contract particularly significant; thus, even if the repair and remedy failed entirely, the plaintiff was at least left with a minimum adequate recovery.

The *Clark* court, however, distinguished *Westinghouse* from the case pending before it, reasoning that the tractor was not a highly complex or experimental piece of equipment, but a standardized piece of farm equipment, "which the plaintiffs were fully entitled to expect would be delivered to them free of defects which could not be cured within a reasonable time." Furthermore, the *Clark* court noted there was a significant disparity between the parties and the terms of the contract were contained in printed form and not the result of painstaking negotiations. For these reasons, the *Clark* court concluded:

> Under these circumstances a seller who fails to comply with its obligations under the warranty, such as the repair or replacement duties, cannot receive the benefit of the other provisions, which in part at least were premised on the assumption that the seller would fulfill its obligations. The failure of the limited remedy in this case would materially alter the balance of risk set by the parties in the agreement. In such a situation, we conclude that the other limitations and exclusions on the seller's warranties and liability must be disregarded and that the general provisions of the UCC should govern the rights of the parties.

*Id.* at 343-44, 584 P.2d at 801-02.

The question the Court must answer in this case is whether the circumstances here more closely resemble those in *Clark* or those in *Westinghouse.* In asking this question, the Court may also examine the remedy provisions to determine whether DeLaval's alleged default caused a loss to the DeVries which was not part of the bargained-for allocation of risk. Here, the dairy equipment is arguably more complex than the tractor in *Clark.* However, it does not amount to the highly complex, sophisticated, and in some ways experimental piece of equipment involved in *Westinghouse.* And, while not unsophisticated, the DeVries hardly amount to an industrial giant. Yet, DeLaval also agreed to refund the purchase price of the New Equipment in the case of

default, and, thus, the DeVries are not left without a remedy.  Nonetheless, the Court finds the facts of this case more analogous to *Clark* than *Westinghouse*.  Therefore, the Court recommends that the DeVries be able to pursue their available remedies under the UCC pursuant to I.C. § 28-2-719(2) if they are able to prove that the limited warranty failed of its essential purpose.

### C. Strict Liability

DeLaval also moves summary judgment with respect to the DeVries' claim for strict liability on the basis that the DeVries seek recovery of purely economic loss.

While a manufacturer may be held liable for "physical harm" to person or property caused by its defective product, a manufacturer's liability does not extend to encompass purely economic loss.  *See, e.g. Clark v. Int'l Harvester Co.*, 99 Idaho 326, 333, 581 P.2d 784, 791 (1978).  "[A] contrary rule, which would allow compensation for losses of economic advantage caused by the defendant's negligence [or defective product], would impose too heavy and unpredictable a burden on the defendant's conduct."  *See, e.g., Just's, Inc. v. Arrington Contr. Co., Inc.*, 99 Idaho 462, 468, 583 P.2d 997, 1003 (1978).  The Idaho Supreme Court further articulated the rationale for the economic loss doctrine, quoting *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), as follows:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic

> expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. (Citations omitted).

*Clark*, 99 Idaho at 334, 581 P.2d at 792, *quoting Seely*, 45 Cal.Rptr. at 23, 403 P.2d at 151.

In the context of the economic loss doctrine, the Idaho Supreme Court defines "economic loss" includes "costs of repair and replacement of defective property which is the subject of the transaction, as well as the commercial loss for inadequate value and consequent loss of profits or use, *Salmon River Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 351, 544 P.2d 306, 309 (1975), while "property loss" includes "damage to property other than which is the subject of the transaction." *Id.*

The DeVries attempt to circumvent the economic loss doctrine by asserting that the DeLaval equipment caused substantial property damage to the DeVries' dairy herd.  The Court, however, believes this issue was properly resolved in *Myers v. A.O. Smith Harvestore Products. Inc.*, 114 Idaho 432, 432, 757 P.2d 695, 697 (Ct. App. 1988).  In *Myers*, the plaintiffs purchased a feed storage and delivery system, which consisted of a silo and power-operated unloading unit, from the defendant seller and defendant manufacturer.  The silo failed to function as promised and the hay stored in the silo deteriorated and the plaintiffs' combined dairy herd began to suffer from decreased milk production.  The plaintiffs sought help from the defendant seller but the seller was unable to cure the defects.  The plaintiffs then filed an action against defendants for, *inter alia,* negligence and strict liability.  In affirming the district court's decision to grant summary judgment in favor of defendants as to negligence and strict liability, the *Myers* court noted that the plaintiffs had not "plead any specific damages due to losses in the feed or cattle value."  *Id.* at 436, 757 P.2d at 699.  Because "[t]he losses suffered as a result of feed

**Report and Recommendation - Page 27**

deterioration and cattle illness were manifested by income changes brought on by reduced milk production, the court held that the defendants were not liable to plaintiffs in negligence or strict liability as the plaintiffs' claims were for economic losses properly addressed as predicated upon contract claims rather than as tort claims.  *Id.*

Despite the DeVries' best efforts to distinguish *Myers* from the circumstances of this case, the Court finds the facts of *Myers* strikingly analogous the facts of this case.  As in *Myers*, the damages to the cattle in this case arose from the failure of the product to match the buyers' commercial expectations and were manifested by lost profits and consequential business losses resulting from alleged failures of the milking equipment and decreased milk production.  And as in *Myers*, although the DeVries did allege property damage of a sort, the essence of their claim is the loss of a contractual benefit of a properly functioning milking system in addition to consequential damages.  "When a loss results from mere product ineffectiveness, it is the law of contracts and commercial transactions, rather than strict products liability, which fixes responsibility for the loss.  *Myers*, 114 Idaho at 436, 757 P.2d at 699 (*quoting Purvis v. Consolidated Energy Products Co.*, 674 F.2d 217, 223 (4th Cir. 1982).  Therefore, as the Idaho Court of Appeals held in *Myers*, the Court finds these economic losses may be properly addressed as predicated upon the contract claims, not in tort.

### III.
### Motion to Amend

The DeVries seek to amend the Complaint to add a claim for punitive damages. Idaho law permits an amendment to add a claim for punitive damages when the plaintiff has established a reasonable likelihood of proving facts at trial that the defendant acted in a manner that was an

extreme deviation from reasonable standards of conduct and that the act was performed by the defendant with an understanding of or disregard for its likely consequences. *Weaver v. Stafford*, 134 Idaho 691, 700, 8 P.3d 1234, 1243 (2000). The justification of punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that be termed "malice, oppression, fraud or gross negligence"; "malice, oppression, wantonness"; or simply "deliberate or wilful." *Highland Enters., Inc. v. Barker*, 133 Idaho 330, 348-349, 986 P.2d 996, 1014-15 (1999).  Therefore, to support a motion to add punitive damages under I.C. § 6-1604, the DeVries must establish a reasonable likelihood they could prove by a preponderance of the evidence that DeLaval acted oppressively, fraudulently, wantonly, maliciously or outrageously. *See Vaught v. Dairyland Ins. Co.*, 131 Idaho 357, 362, 956 P.2d 674, 679 (1998).  The Idaho courts have defined malice as the general disregard for the truth or falsity of a statement.  *Stafford*, 134 Idaho at 700, 8 P.3d at 1243.

The Court finds that the DeVries have established a reasonable likelihood of proving facts at trial sufficient to support a claim for punitive damages.  If the DeVries are able to prove at trial that DeLaval deliberately delivered mislabeled and expired teat dip in violation of the law, and deliberately concealed that it had installed a 3" milk line rather than a 4" milk line in violation of the terms of the original purchase agreement, this would constitute an extreme deviation from reasonable standards of conduct and justify an award for punitive damages.

However, by recommending that the amendment be allowed does not automatically translate into allowing the matter to be presented to the jury.  The trial court will be in the best position to evaluate whether the jury should be instructed as to punitive damages after it has heard all of the testimony at the trial.  The Court would further recommend that even if the issue of

**Report and Recommendation - Page 29**

punitive damages is to be presented at the trial, that the trial court consider bifurcating that issue from liability and other damages.


## <u>RECOMMENDATION</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY RECOMMENDED that:**

1) Defendants' Motion for Summary Judgment (Docket No. 23), filed on January 5, 2006, be GRANTED IN PART and DENIED IN PART.

2) Plaintiffs' Motion to Amend/Correct to Add Claim for Punitive Damages (Docket No. 32), filed on January 6, 2006, be GRANTED.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.


DATED: June 1, 2006

Honorable Mikel H. Williams
United States Magistrate Judge